UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE UNIVERSAL CHURCH, INC., <br><br> Plaintiff, <br><br> v. <br><br> STANDARD CONSTRUCTION COMPANY OF SAN FRANCISCO, INC, et al., <br><br> Defendants. | Case No. 14-cv-04568-RS <br><br> **ORDER DENYING DEFENDANT SESTAK'S MOTION FOR SUMMARY JUDGMENT OR ADJUDICATION** |

## I.   INTRODUCTION

Plaintiff The Universal Church, Inc., entered into a contract with defendant Standard Construction Co. of San Francisco to repair the roof of its church that sits at the corner of 20th Street and San Carlos Street in San Francisco, California.  Defendant Thomas Sestak is Standard's owner, president, responsible managing officer, and a licensed general building and roofing contractor.  While Standard was working on the Church's roof, a fire started, causing extensive damage to the building.  The Church avers that Sestak is liable for negligence and breach of contract as Standard's alter ego.  In addition, the Church contends that Sestak is personally liable for negligence.  Sestak has filed this motion for summary judgment on both claims.

This matter is suitable for disposition without oral argument pursuant to Local Rule 7-1(b).  There is a triable issue of material fact as to whether Sestak was Standard's alter ego and whether Sestak personally was negligent.  Accordingly, Sestak's motion for summary judgment on those

claims is denied.

## II. FACTS AND PROCEDURAL HISTORY[1]

### A. The Fire

The Church needed to repair two sections of its sloped, oddly shaped roof. Standard's Bruce Mullins prepared an estimate for these repairs according to guidelines that Sestak drafted for Standard's employees to use. Mullins Dep. 30:13-32:1, Karic Decl. Ex. 12. After reviewing the estimate, the Church and Standard agreed to the terms of the roofing repair contract, which included an agreement to name the Church as an additional insured under Standard's liability insurance policy. Sestak approved and signed the additional insured agreement. Sestak Dep. 67:12-68:9, Karic Decl. Ex. 10.

On August 13, 2014, Standard's foreman, Teodoro Prieto, and workers Oscar Delgado, Alex Hernandez, and Jose Riviera arrived at the Church's location to begin working on the roof. Prieto was apparently confused about which portions of the roof needed repairs and thought the contract authorized repairing a portion of the roof on the southwest corner of the building. *See* Prieto Dep. 30:24-31:8, 47:2-48:1, Karic Decl. Ex. 8. Before beginning work on the roof, Prieto measured the southwest corner of the roof and discovered that it made moving around difficult because of its odd shape and slope. The workers had to climb to the top of a sloped, gabled roof, traverse a ridge, and then climb down another ladder to reach the flat southwest corner of the roof. *Id.* at 51:15-22. Given these difficulties, Prieto concluded that the best way to minimize the difficulty of hauling asphalt over the pitched roof was to "torch down" roofing materials and hire someone to perform "hot torch" work. *Id.* 56:9-58:19. "Torch down roofing" is a roofing material applied by heating its underside with an open flame. Sestak Dep. 77:4-17. Delgado recommended Prisiliano Juarez to do the hot torching because Delgado had worked with Juarez

---

[1] Both parties submitted lists of evidentiary objections. Unless stated otherwise, the objections are overruled. Contrary to Local Rule 7-3(a), Sestak filed a separate list of objections to the Church's opposition memorandum and Karic's declaration. Sestak is strongly advised to consult the local rules of the Northern District of California before filing any future papers.

1   before. Delgado Dep. 15:9-13, Karic Decl. Ex. 9. Although Juarez had never worked for
2   Standard, Prieto passed along the recommendation to Sestak. Prieto Dep. 22:14-23:18. Prieto
3   telephoned Sestak to discuss this proposal, and they agreed to discuss the changes the next day.
4   *Id.* at 56:9-58:19.

5   At that time, Juarez joined Standard's work crew at the worksite. Sestak arrived sometime
6   in the morning, and then he and Prieto discussed the change in the work required, materials, and
7   personnel. Prieto Dep. 56:10-57:14, 64:7-16. Prieto pointed to the southwest corner of the roof
8   and explained that its configuration made it more dangerous for the workers to carry the asphalt.
9   Although the contract stated that the roof repair required shingles, which are used for sloped roofs,
10  and torch down roofing is commonly used to repair flat roofs, Sestak approved the change in
11  plans. Sestak Dep. 117:15-118:24. Prieto introduced Sestak to Juarez. Prieto Dep. 65:25-23.
12  According to Prieto, Sestak asked, "You think he's going to be okay?" *Id.* at 66:24. Prieto
13  confirmed that he thought Juarez knew how to use the torch safely, and Sestak approved the
14  change. *Id.* at 66:25-67:9. Sestak did not personally assess Juarez's hot-torch skills. Sestak Dep.
15  at 146:18-147:1.

16  Sestak left the church around 11:15 a.m., and the workers resumed their work on the
17  southwest corner of the roof. First, they applied a layer of asphalt to the wood substrata, covered
18  the asphalt with fiberglass base paper, and then applied a layer of torch down roofing. Prieto Dep.
19  78:5-79:12. Juarez applied the torch down roofing before the workers took an hour-long lunch
20  break at noon. *Id.* at 80:18-81:16. After lunch, Prieto directed Delgado and Juarez to touch up the
21  asphalt and remove debris and materials from the southwest roof before driving to the East Bay to
22  pick up some materials. *Id.* at 82:20-83:1, 84:2-15. Sometime around 2:30 p.m., Delgado noticed
23  smoke coming from the southwest roof area where he had been working. Upon closer inspection,
24  he discovered a fire ablaze underneath the roof. Delgado Dep. 62:19-63:13. The workers called
25  the San Francisco Fire Department, which arrived shortly thereafter and extinguished the fire.
26  The Church retained Keith Warner, a certified fire cause and origin investigator, to

determine the cause of the fire.[2]  Warner Decl. ¶¶ 1, 3.  Warner has concluded that a propane open flame torch caused the fire.  *Id.* ¶ 4.  Charles Peterson, a licensed roofing contractor, also reviewed information about the construction work and concluded that Sestak's supervision of the work at the church fell below the standard of care for supervising roofing contractors.  Peterson Decl. ¶ 4; Ex 1 ¶ 7.  Specifically, Peterson concluded that Sestak (1) permitted untrained workers to install the torch down roofing materials; (2) failed to verify Juarez's qualifications to use an open torch; (3) failed to perform the roofing work in accordance with the manufacturer's application instructions, the San Francisco Building Code, and the San Francisco Fire Department Fire Safety Rules for Roofing Operations.[3]

According to the Church, the fire and water damage to the building was such that the main sanctuary was unsuitable to hold services for many months.  The Church claims that the cost to restore the church, including permits and fees, amounts to $2,301,086.43.  Spiegel Decl. ¶ 4, Ex. 1.[4]  During the restoration process, the Church had to spend about $3,300.00 to waterproof temporarily the burned area and $250,000 to rent space for services.  In addition, the fire destroyed personal property to the tune of $39,733.04.  *Id.* ¶ 6, Ex. 2.

### B. Standard Construction and Thomas Sestak

Standard Construction is a licensed general building and roofing contractor doing business

---

[2] Sestak challenges the admissibility of Warner's opinions and report on numerous bases, including that Warner's testimony is inadmissible under Rule 702.  He has not, however, filed a separate motion to exclude Warner's testimony.  Warner appears to be qualified to offer expert opinions about the cause of fires, and Sestak has not suggested any reason to believe that his opinions are unreliable.  Accordingly, the objection is overruled.

[3] Peterson repeats the San Francisco Fire Department's conclusion that hot work caused the fire.  Peterson Decl. ¶ 4.  Sestak has objected to the admissibility of this opinion as hearsay and improper expert testimony.  The SFFD report and its conclusions, however, may provide a foundation for Peterson's conclusions.  Fed. R. Evid. 703.  The objection is therefore overruled.

[4] Sestak has objected to the admissibility of Spiegel's conclusions and expert report, but has not filed a separate motion.  Spiegel, who is a licensed general, flooring, painting, and decorator contractor and co-owner of a consulting firm specializing in assessing property damage, appears to be qualified to offer opinions about property damage, property damage repairs, and reconstruction.  Sestak offers no reason to find that Spiegel's methods are unreliable.  Thus, the objection is overruled.

in California as Standard Roofing Company since 1969. When Sestak founded Standard Construction, he and his partner ran the business out of a warehouse at 1226 9th Avenue in San Francisco. After a few years, Sestak bought the business and the building from his partner. Sestak Dep. 34:15-36:8. Standard Construction issues common stock—51% of which Sestak owns. The remaining 49% belongs to his wife, Antoinette Sestak. Sestak Dep. 21:19-22:11. Sestak is Standard Construction's president, chief executive officer, responsible managing officer, and the only Standard Construction employee with a contractor's license. Until 2014, he also served as the company's treasurer. *Id.* at 23:13-24:1, 53:2-24. Standard Construction employs between twelve and thirteen employees. *Id.* at 44:13-14.

### III.  LEGAL STANDARD

A party is entitled to summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party who seeks summary judgment bears the initial responsibility of identifying an absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party satisfies this initial burden, the non-moving party must present specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324. "Only disputes over facts that might affect the outcome of the suit under governing law" are material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine issue exists if the non-moving party presents evidence from which a reasonable fact-finder, viewing the evidence in the light most favorable to that party, could resolve the material issue in his or her favor. *Id.* at 248-49.

### IV.  DISCUSSION

The Church sued Sestak in his individual capacity for negligence and as the alter ego for Standard Construction for negligence and breach of contract. It does not contend that Sestak is personally liable for breach of contract, nor could it; Sestak was not a party to the contract. Because diversity provides the basis for federal jurisdiction, and California is the forum for this suit, California's substantive law controls the outcome of this case. *See Firstmark Capital Corp.*

*v. Hempel Fin. Corp.*, 859 F.2d 92, 93 (9th Cir. 1988).

**A. Individual Negligence**

Although Sestak did not install or repair the roof, the Church contends that Sestak personally committed a least four negligent acts: (1) approving the use of torch-down roofing instead of shingles; (2) approving work on the wrong portion of the roof; (3) hiring Juarez without verifying or monitoring his open-torch skills; and (4) failing to perform the services required by the contract in a competent and reasonable manner. "A corporate officer or director is, in general, personally liable for all torts which he authorizes or directs or in which he participates, notwithstanding that he acted as an agent of the corporation and not on his own behalf." *Transgo, Inc. v. Ajac Transmission Parts Corp.*, 768 F.2d 1001, 1021 (9th Cir.1985) (internal quotation marks omitted). "[L]ike any other employee, officers individually owe a duty of care, independent of the corporate entity's own duty, to refrain from acting in a manner that creates an unreasonable risk of personal injury to third parties." *Michaelis v. Benavides*, 61 Cal. App. 4th 681, 685 (1998) (internal alterations and quotation marks omitted). This principle applies regardless of whether the plaintiff can prove that the individual was an alter ego and pierce the corporate veil. *Chase Inv. Servs. Corp. v. Law Offices of Jon Divens & Associates, LLC*, 748 F. Supp. 2d 1145, 1182 (C.D. Cal. 2010).

First, Sestak complains that the Church did not plead these theories of liability in its complaint, and they therefore are not available in opposition to a motion for summary judgment. *See Wine Grp., LLC v. L. & R. Wine Co.*, No. 2:10-CV-02204-MCE, 2012 WL 3962500, at *6 (E.D. Cal. Sept. 10, 2012) (citing *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1292 (9th Cir.2000); *Ins. Co. of N. Am. v. Moore*, 783 F.2d 1326, 1327–28 (9th Cir.1986)) ("On a motion for summary judgment, Plaintiffs' allegations and theories of liability are confined to those found in the operative complaint."). In the complaint, the Church avers that defendants, including Sestak, "had the duty of care to perform [repair] work in the manner of a reasonably prudent person in the circumstances with requisite skill and care," but then breached that duty of care "by performing their repair work on the roof in such a negligent manner, and without the requisite skill and care."

1  Compl. ¶¶ 29-30.  While the complaint is not entirely clear, the Church has adequately pleaded a
2  claim that Sestak negligently performed repair work on the roof.  Although Sestak did not
3  personally install the roof, he performed "repair work" by supervising the workers who did.
4        Second, Sestak insists that he did not breach any duty of care because he did not personally
5  operate the open-flame torches that caused the fire.  Under California law, a qualifying licensee,
6  officer, director, or shareholder of a corporate contractor is personally liable for negligent conduct
7  if he or she personally performed the negligent work, authorized the negligent work, or directed
8  that the negligent work be done.  *Nasrawi v. Buck Consultants, LLC*, 713 F. Supp. 2d 1080, 1089
9  (E.D. Cal. 2010) (applying California law).  The key inquiry is the degree of personal participation
10 in the negligent conduct.  In *Michaelis*, the California Court of Appeal concluded that the
11 company's only qualifying licensee, who happened also to be president, director, and fifty-percent
12 stockholder in the construction company, was personally liable for negligent construction because
13 he directed the building of the plaintiffs' driveway, chose which materials to use, and made
14 decisions about construction methods.  61 Cal. App. 4th at 686.  Because the defendant "did not
15 merely make a corporate policy decision which was carried out by someone else" and was a direct
16 decisionmaker, he was personally liable for negligent construction.  *Id.*
17       Here, the Church has provided enough evidence that Sestak was personally involved in the
18 decisions that led to the fire.  Sestak approved the decision to change the construction materials
19 from shingles to torch down roofing, which required changing the construction method.  He also
20 personally chose to hire Juarez without determining whether he had the necessary skills to use an
21 open-flame torch.  Standard Construction's workers did not have authority to hire Juarez or begin
22 using torch-down roofing without Sestak's approval on the date of the fire.  The Church has
23 offered evidence that connects Sestak's decisions to the fire, *see* Warner Decl. ¶ 4, which Peterson
24 concludes violated of the SFFD Fire Safety Rules and chapter 15 of the California Building Code.
25 Peterson Decl. ¶ 4.  In addition, Peterson offers the opinion that Sestak did not reasonably train or
26 supervise Juarez and his other workers as they used an open-flame torch.  *Id.*  Thus, a reasonable
27 jury may credit the testimony of Warner and Peterson and find that Sestak performed his duties as

a contractor negligently. As such, summary judgment is not appropriate with respect to the negligence claim against Sestak in his individual capacity.

**B. Alter Ego**

The Church also seeks to hold Sestak personally liable for negligence and breach of contract as Standard Construction's alter ego. "Ordinarily, a corporation is regarded as a legal entity, separate and distinct from its stockholders, officers and directors, with separate and distinct liabilities and obligations." *Sonora Diamond Corp. v. Superior Court*, 83 Cal. App. 4th 523, 538 (2000). Individual shareholders, directors, and officers may be personally liable, however, when there is evidence that they have used the corporate form "to perpetuate a fraud, circumvent a statute, or accomplish some other wrongful or inequitable purpose." *Id.* The alter ego doctrine applies to both contract and tort claims. *Minton v. Cavaney*, 56 Cal. 2d 576, 580 (1961). At the summary-judgment stage, the Church need not prove that Sestak is, in fact, Standard Construction's alter ego; it needs to demonstrate only that there are triable issues of fact. *U.S. Small Bus. Admin. v. Alto Tech Ventures, LLC*, No. 07-4530 SC, 2008 WL 5245903, at *16 (N.D. Cal. Dec. 17, 2008) (citing *Associated Vendors, Inc. v. Oakland Meat Co.*, 210 Cal. App. 2d 825, 836 (1962)).

To pierce the corporate veil, a plaintiff must show that the individual acted as an alter ego of the corporation with evidence that "(1) such a unity of interest and ownership exists that the personalities of the corporation and individual are no longer separate, and (2) an inequitable result will follow if the acts are treated as those of the corporation alone." *RRX Indus., Inc. v. Lab-Con, Inc.*, 772 F.2d 543, 545 (9th Cir. 1985) (citing *Automotriz Del Golfo De Cal. S.A. De C.V. v. Resnick*, 47 Cal.2d 792, 796 (1957)). "A finding of bad faith . . . is not prerequisite to the application of the alter ego doctrine under California law." *Id.* at 546 (citing *Automotriz*, 47 Cal. 2d at 797). Evidence that the corporate officers and corporation had unity of interest may include that "[t]he equitable owners of a corporation . . . treat the assets of the corporation as their own and add or withdraw capital from the corporation at will," or that they "provide inadequate capitalization and actively participate[d] in the conduct of corporate affairs." *Minton*, 56 Cal. 2d

at 579.

The Church first argues that Standard Construction was undercapitalized. As evidence, the Church points to Standard Construction's tax returns, which consistently show that Standard Construction regularly had negative cash balances, no accounts receivable, and no significant assets. *See* Karic Decl. Exs. 4-7, Tax Returns. Sestak's contractor license has been suspended three times because he and/or Standard Construction failed to submit payments: first, when Sestak did not pay his licensing fee; second, for failing to renew his workers' compensation insurance; and, third, for failing to pay a material supplier's judgment. Sestak Dep. 16:8-22, 18:17-21, 20:14-18. In addition, Standard Construction racked up overdraft and insufficient-funds charges between January 2014 and September 2015. Karic Decl. Ex. 14, Bank Statements. These facts all suggest that Standard Construction was operating on a shoestring and support a finding that Sestak is Standard Construction's alter ego.

Second, the Church insists there is evidence that Sestak comingled his and Standard Construction's assets. As evidence of comingling, the Church focuses on evidence that Sestak and Standard Construction treated the property on 9th Avenue as personal as well as corporate property. Sestak personally owned the property on 9th Avenue, while Standard Construction paid the property taxes, insurance, maintenance and upkeep costs, and mortgage payments to the lender. Sestak Dep. 41:3-20. Although Sestak owned the property, Standard Construction listed it as its only depreciable asset. *Id.* at 252:1-14. From this evidence, a reasonable jury might conclude that Sestak's and Standard Construction's assets were one and the same.

In addition, the Church argues that Sestak strategically adjusted his personal salary from the company to reap the greatest tax benefits for him and the business. When the business was operating at a net loss, Sestak drew a salary. For example, in fiscal year 2010, Standard Construction had a net operating loss of $70,712, and Sestak took a personal salary of $60,000. Karic Decl. Ex. 4, 2010 Tax Returns. In fiscal year 2012, Standard Construction's operating loss was $61,167, but Sestak's personal salary was $80,000. Karic Decl. Ex. 6, 2012 Tax Returns. Again, in fiscal year 2013, Sestak's personal salary was $48,000, while Standard Construction had

a $38,400 loss.  Karic. Decl. Ex. 7, 2013 Tax Returns.  When Standard Construction had a net operation gain in 2011, however, Sestak did not take a personal salary at all.  Karic Decl. Ex. 5, 2011 Tax Returns.  The Church argues that foregoing a personal salary allowed Standard Construction to carry the previous year's losses on its 2011 tax return and pocket the remaining amount without paying taxes.  Although there is no direct evidence that Sestak adjusted his personal salary to avoid paying personal taxes or those of Standard Construction, the Church may make this inferential argument to a jury, and there is sufficient evidence that would permit a jury to accept it.

The Church also highlights numerous loans to unidentified shareholders[5] as evidence that Sestak has used Standard Construction's assets for his personal benefit.  On its 2011 tax return, Standard Construction identified a loan to shareholders in the amount of $27,970.  *Id.*  In 2012, Standard Construction again issued a loan to its shareholders in the amount of $44, 955.  Karic Decl. Ex. 6, 2012 Tax Returns.  When Standard Construction posted net operating gains, however, Standard Construction paid Sestak $51,711 for a loan repayment.  Karic Decl. Ex. 7, 2013 Tax Returns.  Undocumented, interest-free loans support a reasonable inference that Sestak was Standard Construction's alter ego.  *See Doe v. Unocal Corp.*, 248 F.3d 915, 927 (9th Cir. 2001) ("Evidence that a parent provides interest free loans without observing corporate formalities by documenting those loans with promissory notes supports a finding that the parent is the subsidiary's alter ego.").

Not only has the Church offered evidence of undocumented loans to the Sestaks, it also has produced evidence from which a jury could conclude that Standard Construction was paying the Sestaks' personal debts.  Standard Construction's bank records[6] reveal that it made payments to

---

[5] Sestak and his wife are Standard Construction's only shareholders.

[6] Sestak asserts that these bank statements are hearsay.  These records appear to satisfy the business-records exception to the hearsay rule, however, which applies to records "made at or near the time" of an act or event, "kept in the course of regularly conducted activity of a business," and "making the record was a regular practice of that activity."  Fed. R. Evid. 803(6)(A)-(C).  The Church has shown that these conditions are met by the testimony of Bank of America's record custodian.  *See* Fed. R. Evid. 803(6)(D); Karic Decl. Ex. 14, Aff. Bank of America Records

1   the Internal Revenue Service in 2014 and 2015 even though it did not have any federal tax

2   liabilities for those years. *See* Karic Decl. Ex. 4-7, Tax Returns; Ex. 14, Bank Statements. In

3   addition, Standard Construction made three payments to Mrs. Sestak's personal credit card

4   account and four others to an unidentified credit card account. *See* Karic Decl. Ex. 14, Bank

5   Statements.[7] These facts imply that the lines between Standard Construction's and the Sestaks'

6   financial matters were blurred. Sestak contends there are facts that undermine these inferences,

7   but has not specifically pointed to where in the record contradictory information can be found.

8   Regardless, whether the inferences the Church draws from tax returns and bank statements of the

9   Sestaks and Standard Construction supports the Church's inferences is a task for the jury.

10        Finally, the Church relies on evidence that Sestak exerted significant dominion and control

11   over Standard Construction's day-to-day operations and financial matters. Evidence that a man

12   and his company "are one and the same" is also evidence of an alter-ego relationship. *McCombs*

13   *v. Rudman*, 197 Cal. App. 2d 46, 49 (Ct. App. 1961). Evidence of this coterminous relationship

14   includes evidence of a sole owner who exercises exclusive control over the affairs of the business.

15   *See id.* at 50-51. There is ample evidence that "responsibility for the operation of [Standard

16   Construction] rested upon [Sestak] alone." *Id.* at 50. For example, Sestak and his wife own 100%

17   of Standard Construction's common stock. As the company's only contractor licensee, CEO,

18   president, and responsible managing officer, Sestak oversees most of Standard Construction's day-

19   to-day operations. Indeed, until recently, Sestak was Standard Construction's treasurer, too, which

20   raises an inference that he has exercised significant control over the company's finances. All of

21   these facts may lead a reasonable jury to conclude that Standard Construction and Sestak shared

---

Custodian. Nor has Sestak demonstrated that "the source of information or the method or circumstances of preparation indicate a lack of untrustworthiness." Fed. R. Evid. 803(6)(E). Accordingly, the objection is overruled.

[7] The Church also references Standard Construction's numerous unidentified cash withdrawals in large sums as evidence that the Sestaks were comingling their funds with the company. However, the Church fails to connect those cash withdrawals to any payments to or on behalf of the Sestaks, and thus this evidence cannot, without more, support a finding that the Sestaks used this cash.

unity of interest.

To hold Sestak personally liable for Standard Construction's conduct, the Church must also show a reasonable jury would conclude that "an inequitable result will follow if the acts are treated as those of the corporation alone." *RRX Indus.*, 772 F.2d at 545.  To satisfy this requirement the Church argues that it will have difficulty collecting from Standard Construction because of the company's undercapitalization.  By comparison, there appears to be evidence that Sestak has assets to pay a potential judgment in the Church's favor.  Sestak personally received significant profits from the sale of the property on 9th Avenue.  The proceeds from that sale have not been credited to Standard Construction even though it has paid property taxes, mortgage payments, and the costs of repairs for many years.  These facts raise a reasonable inference that the Church will be unable to cover the cost of repairs without access to Sestak's assets.  Accordingly, the Church has demonstrated that a reasonable jury could conclude treating Standard Construction and Sestak separately may lead to an inequitable result.

In short, the Church has produced sufficient evidence from which a jury could conclude that Sestak was Standard Construction's alter ego:  evidence of comingling funds, evidence of undercapitalization, and evidence of Sestak's significant control over Standard Construction's business and financial matters.  Although Sestak has offered evidence to suggest otherwise, such as the fact that Standard Construction maintained corporate minutes and separate bank accounts, that evidence is not so overwhelming that no reasonable jury could find that Sestak was Standard Construction's alter ego.

V. CONCLUSION

To proceed to a jury trial against Sestak in his individual capacity, the Church had to demonstrate that there were material disputes of fact about whether Sestak's personal negligence caused the fire to the property and whether Sestak is Standard Construction's alter ego.  It has done so, and accordingly Sestak's motion for summary judgment must be denied.

**IT IS SO ORDERED**.

CASE NO. 14-cv-04568-RS

Dated: December 2, 2015

_____
RICHARD SEEBORG
United States District Judge